EVERETT PULP & PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21726, 30371.   Promulgated July 16, 1931.

*A. S. Lisenby*, *Esq.*, and *Hugh Satterlee*, *Esq.*, for the petitioner.
*Arthur H. Murray*, *Esq.*, and *Philip M. Clark*, *Esq.*, for the respondent.

OPINION.

ARUNDELL: The petitioner asks us on the record made to hold that the facts warrant the determination of petitioner's taxes under sections 327 and 328 of the 1918 Act instead of at the statutory rates. The grounds alleged are that the invested capital can not be determined and, furthermore, that there is an abnormality within the meaning of subdivision (d) of section 327 of the Revenue Act of 1918.

We suppose all will concede, where the statute provides for the determination of the tax under the provisions of section 328 in a case where the invested capital can not be determined, that it does not mean that every penny must be definitely traced. If this be so, the determination of the tax under section 328 would be the usual rather than the unusual method. It is a well known fact that before the incidence of the income tax strictly accurate accounting records were seldom to be found. Especially was this true in the case of small or closely held corporations such as petitioner, where it was not important whether or not certain items were charged to capital account or to expense. Congress. was conversant with this fact, but it certainly did not intend because of the difficulty of the proof, or where the irregularity in the accounting method was not substantial, that such an extraordinary method as section 328 should be resorted to.

Section 326 of the Revenue Act of 1918, defines invested capital as, "Actual cash bona fide paid· in for stock or shares; actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment * * *; paid-in or earned surplus and undivided profits * * *." The Commissioner has determined what he says is petitioner's invested capital, but petitioner disputes the Commissioner's ability to make the determination, because it claims that its earned surplus may not be determined by reason of the fact that certain so-called plant items were charged to expense which should have been capitalized, and it is now impossible to correct the errors so made. The determination by the Commissioner of petitioner's invested capital as we understand it is not challenged except as it relates to the plant account. For the year 1918 the Commissioner determined a total invested capital of $1,800,-354.53, in reaching which figure he determined petitioner's plant account to be $723,635.66. For the year 1920 the total invested capital was determined by the Commissioner to be $2,209,568.73, and petitioner's plant account was fixed at $735,319.78. In reaching the figure that he did for the plant account in 1918 and again in 1920, the Commissioner made various adjustments which served to correct the plant account as recorded on petitioner's books, chief among which was to restore to the capital account $93,532.48, an amount arbitrarily charged out of petitioner's plant account on December 31, 1909, and to restore to invested capital the sum of $279,287.35, less depreciation thereon of $21,685.84, covering capital items previously charged to expense. A further allowance was made of $32,192.79, less adjustments for depreciation and abandoned items, which had been improperly charged to expense. The restoration resulted altogether from the research efforts of accountants employed by petitioner to that end, a matter about which we will speak further on in this opinion.

In support of its contention that its invested capital can not be determined, petitioner approaches the matter from several angles. It appears that in 1920 the American Appraisal Company appraised petitioner's property. With this appraisal as a guide, an accountant was employed who attempted to trace the cost of the several items included therein and was able to locate 80 per cent of the items, though as to some of them he could not determine such incidental costs as freight, installation charges, and overhead chargeable to the items. As to 20 per cent of the items he could not trace or identify their cost. The identified items were restored to invested capital by the Commissioner in the amounts requested by the petitioner, after adjustments for depreciation and abandoned items were made. The record is absolutely silent as to the nature of the items constituting the 20 per cent the cost of which the accountant did not determine. The appraisal was not offered in evidence. The ease with which large items may be traced compared with minor ones in our opinion warrants the inference that the items the cost of which could not be determined were minor rather than major items. Nor was there any evidence offered as to the number or nature of the items the installation, freight costs, and overhead of which could not be located. We are left to conjecture where we might have been advised.

Various exhibits were presented which listed large numbers of items which it was claimed should have been capitalized, but which were in fact charged to expense. These items ranged in cost from one dollar to several hundred dollars. While we do not understand that the lists were intended to be complete, but rather typical of items improperly charged to expense, we are nevertheless impressed with the fact that they represent a careful combing of the expense account for items which it may have been proper to capitalize. How many of these items so listed were ones which were later restored to capital account by the Commissioner as a result of the accountant's work we do not know. In the early years of petitioner's life it appears that the charges were made pursuant to specific instructions of Howarth, the general manager, and after 1904 all outside purchases and labor charges were capitalized and all labor costs of their employees, if they be related to such items, were likewise capitalized. The testimony of Jordan, the plant superintendent, and one of the three controlling interests, was to the effect that the custom in the industry was to charge all but large items to expense.

As examples of work performed, the cost of which was charged to expense and which it is now said to be impossible to trace, were the filling in of five or six acres of marshy ground, replacement of rotting piling, installing of various water pipes, the re-siding of

certain buildings, etc. The labor for this work was largely performed by various employees, at odd times when their services were not otherwise needed and over a period of twenty years. The marshy ground was reclaimed by filling in dirt from land that had been leveled for building purposes and by dumping sawdust, cinders and plant refuse thereon. We have no idea of the amount and value of the sawdust used. While the enlargement of the water system would appear at first blush as a capital item, the manner of making the change a little at a time over a long period of years makes it difficult to definitely stamp it one way or another. This same comment we believe apropos to the re-siding of the buildings, and the other items mentioned in this paragraph. Not even an approximate cost was suggested as to the items as a whole or any one of them.

The testimony discloses that in 1920 petitioner installed a new system of books which it claims clearly reflects its operations by capitalizing what properly should be so treated and charging the balance to expense. It is interesting to note that plant repairs during 1920 were in the amount of $82,234.80, which figure does not compare unfavorably with the sums charged to expense in prior years.

Our conclusion is that petitioner has failed to sustain its burden that its invested capital may not be determined.

In support of its claim that there is an abnormality of income within the meaning of section 327 (d), petitioner asserts that salaries to officers were low and that petitioner had developed a formula of value for the production of wood pulp.

It is not enough that salaries paid officers be low. To come within the provisions of section 327 (d) it must be shown that the salaries paid are abnormally low in comparison with other corporations. *High Shoals Co.*, 3 B. T. A. 305; *Moody & Waters Co.*, 14 B. T. A. 290.

The evidence fails to convince us that a reasonable annual salary for Jordan and Howarth would have been $50,000 each, the amount suggested by petitioner. Jordan frankly admitted that the petitioner would not have brought two outsiders into the organization and paid them $50,000 apiece. The salaries paid these two officers certainly were not nominal, even although the business might have justified paying more. Nothing was offered to show the salaries paid by other similar corporations for like services. We can not say that the salaries paid created an abnormal condition.

The formula used by petitioner, as we understand it, was the application of the soda process to the production of pulp from Douglas fir. The soda process had been used generally in the indus-

try for years. There is no secret about it and there is no patent. Where the wood out of which pulp is made varies the formula has to be varied and so to get the best results from Douglas fir petitioner watched each " cook " and varied the solution, or the temperature as experience dictated until it was getting good results. The field was open to other paper manufacturers having available a supply of Douglas fir. Jordan concedes this though he thinks a new company would have " grief " until it learned from experience the best formula. In fact another paper company did use this very formula, though it hired away some of petitioner's employees to help them get started. Other paper companies on the Pacific Coast used Douglas fir, but in making pulp from it they use the sulphite process which is cheaper. Petitioner uses the soda process because its product is print paper which requires the soda process to make.

We are not persuaded that there is an abnormality in petitioner's income warranting the application of the special assessment provisions.

There remains for consideration one other matter, which relates solely to the year 1918. The gist of petitioner's argument in this particular is that the statement made by respondent in his so-called thirty-day letter to the effect that a comparison with representative corporations showed no relief, creates a prima facie presumption that respondent determined petitioner's right to special assessment and that the Board should hold without further proof that it is so entitled to have its profit computed under section 328. We think petitioner's argument is without merit. The proceedings before the Board are bottomed on the notice of deficiency and not on preliminary action taken by the respondent. The deficiency notice contained no admission or concessions, but denied flatly petitioner's right to special assessment. Nor do we believe that respondent's thirty-day letter carries with it the broad implications urged by the petitioner. But even if we are wrong in this particular, our conclusion would be the same, as respondent can not be held to a preliminary action taken by him in the course of the consideration of a case.

Petitioner asks, if its claim for special assessment be denied, that it be granted an increase in its invested capital over that allowed by the respondent. Petitioner's counsel, in the course of the trial of the case and at the time the pleadings were amended so as to raise this issue, frankly stated he was not optimistic enough to believe that this prayer could be granted. We agree with counsel. The proof is insufficient.

*Decision will be entered for the respondent.*